## UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

| | |
|---|---|
| BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, on its institutional behalf and on behalf of its members, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| SAM BROWNBACK, Governor of the State of Kansas, in his official capacity, and DEREK SCHMIDT, Attorney General of the State of Kansas, in his official capacity, | |
| Defendants. | |

## <u>PRELIMINARY STATEMENT</u>

1.      This action is brought by the Brady Campaign to Prevent Gun Violence, on its institutional behalf and on behalf of its members (hereinafter the "Brady Campaign" or "Plaintiff").  Pursuant to District of Kansas Rule 40.2, Plaintiff hereby requests that the trial in this matter be held in Kansas City, Kansas.

2.      Plaintiff seeks declaratory and injunctive relief to prevent Defendants, the Governor of the State of Kansas, Sam Brownback, and the Attorney General of the State of Kansas, Derek Schmidt, in their official capacities, and all other persons acting on behalf of the State of Kansas, under color of law, from continuing to give effect to or otherwise enforcing Kansas Senate Bill 102, codified as K.S.A. §§ 50-1201 *et seq*., (hereinafter, "the Act"), which went into effect April 25, 2013.

3.      Although titled the "Second Amendment Protection Act," the Act in fact seeks to nullify—not protect—federal law governing firearms.  The United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and subsequent federal courts, have made

1

clear that the Second Amendment allows for reasonable firearms regulations, confirming the constitutionality of virtually all, if not all, existing and proposed federal firearms laws.  Yet the Act purports to "declare" the invalidity and inapplicability of federal law to "Kansas" firearms and firearm accessories.  In sweeping language, the Act states that such firearms and accessories are "**_not_ subject to _any_ federal law, treaty, federal regulation, or federal executive action, including _any_ federal firearm or ammunition registration program** …."  The Act extends not just to a purported subclass of "Kansas" firearms and accessories—it also explicitly attempts to nullify any and all federal laws that the State of Kansas might deem inconsistent with its interpretation of the Second Amendment to the United States Constitution.  In the unmistakable language of nullification, the Act provides:  "**_Any act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States is null, void and unenforceable in the state of Kansas_**."

4.       Kansas also seeks to penalize those who disobey its nullification efforts.  The Act imposes criminal and civil liability on those who would "enforce" or "attempt to enforce" federal law within the State of Kansas, sweeping within its broad language the activities of law enforcement officials, judges, and others who may be called upon to enforce federal law.  The Act makes it a crime—a felony—for "**_any_**" United States government "official, agent or employee"—or employee of a private company "providing services" to the government— "to enforce or attempt to enforce" any of the purportedly nullified federal firearms laws in Kansas.  Because this provision extends to "agents" of federal officials and employees, it could impose criminal liability on state and local officials or employees, including state law enforcement personnel, who work in conjunction with federal officials on law enforcement efforts.  Indeed, the Act specifically prohibits any "official, agent or employee of the state of Kansas, or any political subdivision thereof," from enforcing or attempting to enforce any of the purportedly nullified federal laws.  These vague and undefined prohibitions violate due process rights guaranteed by the United States and Kansas Constitutions.

5.       Supporters of the Act have left no doubt about the purpose of the legislation to

nullify federal law in Kansas.  Representative John Rubin explained, "this bill **_declares that there is no constitutional basis_** for the federal government to regulate, restrict, or ban" certain "Kansas" firearms.  Representative Ward Cassidy stated that under the Act, "**_any attempts by the federal government to regulate_**" the use of "Kansas" firearms "**_would be considered unenforceable in the state of Kansas_**."  Senator Forrest Knox called the bill a bulwark against a "**_power grab_**" by an "**_out of control federal government_**."  Representative Allan Rothlisberg told the media that Kansas "should be sending a message that **_we're going to protect our citizens, even from the federal government_**, if need be," and Representative Jim Howell supported the bill because "it was **_absolutely important for the people to defend themselves against a tyrannical government_**."  Representative Arlen Siegfreid, a member of the conference committee that produced the Act's final language, justified the law as a vehicle to "**_get the attention of the federal government_**."  Upon passage of the Act, the law's supporters entered a joint statement into the legislative record proclaiming "**_Kansas sovereignty_**."

6.      The far-reaching nullification provisions of the Act are unconstitutional on their face under long-standing, fundamental legal principles.  Neither the Kansas legislature, nor any state legislature, is empowered to declare federal law "invalid," or to criminalize the enforcement of federal law.  Any legislation or state action seeking to nullify federal law is prohibited by the Supremacy Clause, Article VI, Clause 2, of the United States Constitution, which establishes federal law as supreme and grants the federal judiciary the final power to interpret the Constitution.  As the Supreme Court unanimously declared in *M'Culloch v. Maryland*:

> [T]he States have no power [   ] to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is [   ] the unavoidable consequence of that supremacy which the constitution has declared.

17 U.S. 316, 436 (1819).

7.      The blatantly unconstitutional nullification effort embodied in the Act evokes similar efforts by states in the 1950s during the Civil Rights Movement to nullify federal law

mandating the integration of black students into all-white public schools.  The Supreme Court of the United States held unequivocally that such nullification efforts are unconstitutional.  *See Cooper v. Aaron*, 358 U.S. 1 (1958).  Indeed, nullification has never been upheld and instead has been squarely rejected by the courts under fundamental principles of constitutional law.  The Kansas legislature's attempt to nullify federal firearms laws is unlawful and void for precisely the same reason attempted nullification of desegregation laws was held unconstitutional.

   8. Indeed, upon passage of the Act, the Attorney General of the United States, Eric Holder, wrote a letter to Defendant Brownback notifying him that the law was plainly unconstitutional:

> In purporting to override federal law and to criminalize the official acts of federal officers, S.B. 102 directly conflicts with federal law and is therefore unconstitutional. . . .  Under the Supremacy Clause of the United States Constitution, Kansas may not prevent federal employees and officials from carrying out their official responsibilities.  And a state certainly may not criminalize the exercise of federal responsibilities.

   9. The Act's attempt to create a "carve out" for "Kansas" firearms—meaning firearms that are manufactured in Kansas and remain in Kansas, but may include components and firearm accessories made outside of Kansas—only adds to the constitutional infirmities inherent in the State's nullification efforts.  The State's attempt to create a subset of "Kansas" firearms runs afoul of the Commerce Clause of the United States Constitution.  The Act's definition of "Kansas" firearms is premised, and wholly dependent, on the Act's declaration about the extent of federal congressional authority under the Commerce Clause.  The Act simply ***declares*** that "Kansas firearms" are "***not subject to any federal law . . . under the authority of congress to regulate interstate commerce***."  But under the Supremacy Clause, Kansas has no authority to declare what federal law is.  Federal courts determine the extent of congressional Commerce Clause authority, and federal courts hold that Congress has authority to regulate purely intrastate activities that affect interstate commerce—including the regulation of firearms and firearms accessories, even if, *arguendo*, they were made solely in-state with in-state materials and components.  The State's improper attempt to declare the extent of federal

sf-3388071

congressional authority is most evident in the Act's provision declaring that firearm "component parts" that arrive in Kansas via interstate commerce and that are incorporated into a firearm do not subject that firearm to congressional Commerce Clause authority. Kansas has no authority to abrogate federal Commerce Clause jurisprudence.

10.     The Act significantly harms Plaintiff, its members, and all Kansas citizens, and if not enjoined and invalidated will continue to do so. The Act's nullification provisions could be construed to allow violent domestic abusers to possess firearms in Kansas; allow illegal immigrants, dishonorably discharged veterans, and individuals who have renounced United States citizenship to possess firearms in Kansas; allow unlicensed and undocumented sales of firearms in Kansas; allow the unlicensed manufacture of firearms in Kansas; prohibit the tracking of illegal guns and guns used in crime in Kansas; cripple the investigation of interstate and international gun trafficking through Kansas; allow the manufacture of firearms without serial numbers in Kansas; allow the manufacturing, importation, sale, and possession of firearms in Kansas designed to avoid metal detectors and airport security; allow the unrestricted manufacture in Kansas and subsequent sale to anyone of uncoated armor-piercing ammunition; allow the sale of handguns to individuals aged 18-21; prohibit background checks for firearm purchases in Kansas; prevent local authorities in Kansas from referring gun crimes to federal agencies, including gun trafficking and illegal gun sales crimes that are enforced by federal authorities; criminalize federal agents' investigation of gun crimes in Kansas; and place undocumented firearms and uncoated armor-piercing ammunition into the interstate stream of commerce in Kansas.

11.     The dangers posed by untraceable and virtually unregulated "Kansas" firearms are real, present and growing. In addition to guns that are privately assembled in a home (individually and at "build" parties), Kansas Secretary of State Kris Kobach, who co-authored the Act and testified on its behalf before the Kansas State Legislature, has recently disclosed an ownership interest in Minuteman Defense LLC, which he says will manufacture firearms

sf-3388071

pursuant to the Act.[1]  Mr. Kobach's firearms company plans to produce a rifle based on or similar to the AR-15 platform.  The AR-15 was designed for military use and has a shared fundamental design with the United States military's M16 fully automatic rifle.  AR-15 platform rifles were used in the Newtown, Connecticut; Aurora, Colorado; New Life Church, Colorado Springs, Colorado; Clackamas Town Center, Oregon; and Webster, New York mass shootings.  The co-owner of Minuteman Defense admits that there will be a market for individual sales, and Minuteman Defense will make its firearms available to Kansas retailers.[2]

12.  The Act is unconstitutional on its face and should be enjoined.  It violates the Supremacy Clause and due process guaranteed by the United States Constitution.  It also violates due process, as guaranteed by the Kansas Constitution.  Plaintiff, through its members, and citizens of Kansas and other states will continue to suffer serious and irreparable injury if the Act is not declared unconstitutional and permanently enjoined.

## JURISDICTION AND VENUE

13.  This Court has federal question jurisdiction under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.  Jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiff's claims arising under the Constitution of the State of Kansas pursuant to 28 U.S.C. § 1367.

14.  Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

15.  Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. §§ 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

---

[1] Mary Clarkin, The Hutchinson News, May 15, 2014, *Kobach Takes Advantage of Law He Helped Write,* http://www.hutchnews.com/news/local_state_news/kobach-takes-advantage-of-law-he-helped-write/article_b982773d-254e-5d58-b817-7d8bfac38fb0.html (last accessed Jul. 8, 2014); The Associated Press, The Topeka Capital-Journal, May 16, 2014, *Gun-bill Author Kobach Has Stake in New Firearms Firm*, http://cjonline.com/news/state/2014-05-16/gun-bill-author-kobach-has-stake-new-firearms-firm (last accessed Jul. 8, 2014).

[2] Mary Clarkin, *supra,* note 1.

16.     Venue is proper in the District of Kansas pursuant to 28 U.S.C. § 1391, because the Defendants reside within the District.

## PARTIES

17.     Plaintiff Brady Campaign is a non-profit membership organization existing under the laws of the District of Columbia and having its principal place of business at 840 First Street NE, Suite 400, Washington, D.C. 20002.  The Brady Campaign is a public interest organization that works through its advocacy campaigns and local chapters to reduce gun deaths and injuries through education, research, and public health initiatives.  These educational activities include speaking at events, encouraging safe firearms storage practices, advocating and encouraging community support for sensible firearms policies, sending letters, and issuing press releases.  The Brady Campaign has members across the country, including a chapter in northeast Kansas. Among the Brady Campaign members residing in Kansas are individuals who have faced gun violence themselves, including in the recent hate-crime shootings at the Jewish Community Center of Greater Kansas City ("Kansas City JCC"), and those who have lost family and friends due to gun violence.  In addition, certain Brady members in Kansas are potentially subject to civil and criminal liability under the Act.  The claims made in this action and the interests this action advances are germane to the Brady Campaign's organizational purpose.  The relief requested in this action does not require participation of individual Brady Campaign members.

18.     Brady member Crosby Gernon is the Mayor of the City of Hiawatha, Kansas. Dr. Gernon has been Mayor since 2006.  Under the ordinances of the City of Hiawatha, the mayor, along with the city commissioners, is vested with all executive and administrative authority granted or limited by law.  Under the ordinances of the City of Hiawatha, the Hiawatha Chief of Police is subject to the ordinances and policy decisions adopted by the mayor and the commission.  The Mayor and the commission also adopt policies and procedures that govern city employees, including the Chief of Police.  As mayor, Dr. Gernon is involved in the hiring and firing of the local police chief and becomes involved in serious disciplinary matters involving

police officers.  Dr. Gernon also receives complaints from Hiawatha residents that he instructs the police chief to look into.  In addition, Dr. Gernon is a physician with the University of Kansas Hospital and Associate Professor of Radiology at the University of Kansas School of Medicine.  As Mayor and as a physician and educator at a state-sponsored university, Dr. Gernon is an "official, agent, or employee of the state of Kansas, or any political subdivision thereof" within the meaning of K.S.A § 50-1206.

19.    Paul Temme is a member of the Northeast Kansas Chapter of the Brady Campaign, residing in Prairie Village, Kansas.  The Act directly harms Mr. Temme by reducing the safety and enjoyment of his life in the community.  Over the past year, Mr. Temme has survived two acts of gun violence in Kansas.  On December 31, 2013, Mr. Temme was a witness to a shooting that occurred during a New Year's Eve party at a ballroom dance studio in Johnson County, where his wife was nearly hit by a bullet.  Less than four months later, Mr. Temme was targeted and shot at by the known white supremacist Frazier Glenn Miller a.k.a. Frazier Glenn Cross at the Kansas City JCC.  Miller has been charged with the attempted murder of Mr. Temme.  In the wake of the JCC shooting, Mr. Temme has spoken publicly about his experience and has been the subject of hateful internet attacks that he fears will be acted upon by individuals sympathizing with Miller.  One writer has argued that Mr. Temme "must be attacked with the same level of venomous attack he perpetrates."  Mr. Temme fears for his safety since the Act makes it easier for dangerous individuals such as Miller to obtain firearms and bring them to public places, as it purports to nullify federal laws that, among other things, (a) require background checks on gun buyers; (b) provide for the tracking of illegal guns; (c) require guns to be manufactured with serial numbers; and (d) forbid the manufacture, importation, sale and possession of firearms in Kansas designed to avoid metal detectors and airport security. Mr. Temme further fears for his safety since the Act purports to criminalize federal agents' investigation of gun crimes and prevent local authorities from referring gun crimes to federal agencies.  He fears that joint investigations between the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and local authorities, such as the current ongoing investigation into how

8

Frazier Glenn Miller obtained firearms despite his "prohibited purchaser" status, will be hampered by the Act.

20.    Harold Koch is a member of the Northeast Kansas Chapter of the Brady Campaign and has lived in Kansas for more than forty years.  He currently resides in Leawood, Kansas.  He retired after approximately thirty years as a psychologist.  He is a member of the group Grandmothers Against Gun Violence.  Mr. Koch has experienced first-hand the devastating effects of gun violence, losing his 14-year old brother to a shooting in Kansas City, Missouri in 1953.  Mr. Koch is also a longstanding member of the Kansas City JCC and a volunteer at the Village Shalom Geriatric Center, both of which were the sites of gun violence on April 13, 2014.  He is also an activist in the gun violence prevention movement.  Mr. Koch has received threats after having letters published that he wrote to the editors of local newspapers.  As a result of his experiences, Mr. Koch has a heightened fear of gun violence that is exacerbated by the Act.

21.    Susan Blaney is a member of the Northeast Kansas Chapter of the Brady Campaign and has resided in Prairie Village, Kansas, for nearly twenty years.  She is a retired federal administrative law judge with the Social Security Administration and a member of Grandmothers Against Gun Violence.  The Act directly harms Ms. Blaney by reducing the safety and enjoyment of her life in the community and increasing the fear that her grandchildren may become victims of gun violence when they visit her in Kansas.  As a former judge, Ms. Blaney is familiar with personal threats on her safety and believes that her advocacy efforts on behalf of gun violence prevention make her a potential target.  Grandmothers Against Gun Violence holds regular meetings in community libraries but, with passage of the Act, Ms. Blaney fears that the meetings might be more susceptible to violence.

22.    Loren Stanton is a member of the Northeast Kansas Chapter of the Brady Campaign and a resident of Prairie Village, Kansas, where he has lived for thirty-five years.  The Act directly harms Mr. Stanton by reducing the safety and enjoyment of his life in the community.  Mr. Stanton formed the Gun Violence Prevention Project in 2013, regularly

meeting with local businesses in Kansas to offer support in response to the repeal of a local ban on open-carry.  Mr. Stanton became involved in the gun violence prevention movement after his son's college roommate was shot and killed in December 2000 by the Carr brothers, in a tragedy that has become known as the Wichita Massacre.  Because of laws such as the Act, which undermine the protection offered by federal firearm laws, Mr. Stanton fears for his safety and the safety of his children and grandchildren.

23.     Two long-time residents of Johnson County, Kansas, both members of the Brady Campaign, were also present at the April 13, 2014, shooting at the Kansas City JCC.  The Act directly harms both members by reducing their safety and enjoyment of their lives in the community and by directly amplifying their already heightened fears of gun violence.  The names of both members have been withheld from the Complaint due to their fear for the physical safety of their respective families and due to the fear of retaliation from state and local authorities for their participation in the current lawsuit.

24.     Defendant Sam Brownback is the Governor of Kansas.  Defendant Brownback resides within and has his official office within this District.  Defendant Brownback signed the Act into law.  The Kansas Constitution provides that "[t]he supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state."  Kan. Const. art. 1, § 3.  He is sued in his official capacity.

25.     Defendant Derek Schmidt is the Attorney General of Kansas.  Defendant Schmidt resides within and has his official office within this District.  Defendant Schmidt is the chief legal official and law enforcement official for the State of Kansas.  The Act purports to specifically charge Defendant Schmidt with the power to enjoin United States officials from enforcing the laws and regulations of the United States.  Kansas law charges Defendant Schmidt with the responsibility to "give his or her opinion in writing, without fee, upon all questions of law submitted to him or her by the legislature, or either branch thereof, or by the governor, secretary of state, state treasurer, state board of education, or commissioner of insurance."  K.S.A. § 75-704.  He is sued in his official capacity.

sf-3388071

## BACKGROUND

## THE ACT

26.     Kansas Senate Bill 102 enacted the "Second Amendment Protection Act," codified as K.S.A. §§ 50-1201 *et seq.*  It became effective upon its publication in the Kansas register on April 25, 2013.

27.     The Act, through K.S.A. § 50-1206(a), purports to nullify all federal firearms regulations that the State of Kansas determines violate the Second Amendment of the United States Constitution.  It provides:  "Any act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States is null, void and unenforceable in the state of Kansas."  The Act does not identify the specific federal laws, treaties, orders, rules or regulations that are purportedly nullified by K.S.A. § 50-1206(a).  Statements of supports of the Act confirm the intent of the statute to declare Kansas "sovereignty" with respect to firearms regulation, implying the legislature's intent through K.S.A. § 50-1206(a) to declare that all federal firearms regulations violate the Second Amendment and are therefore void and unenforceable in the State of Kansas.

28.     The Act also purports to specifically nullify federal law with respect to a subset of "Kansas" firearms and accessories.  K.S.A. § 50-1204(a) provides:

> A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce.  It is declared by the legislature that those items have not traveled in interstate commerce.

29.     Sections K.S.A. § 50-1204(b)-(c) purport to define limitations on what constitutes "interstate commerce" for purposes of implementing K.S.A. § 50-1204(a)'s nullification provision.  K.S.A. § 50-1204(b) provides:

> Component parts are not firearms, firearms accessories or ammunition, and their importation into Kansas and incorporation into a firearm, a firearm accessory or ammunition manufactured and owned in Kansas does not subject the firearm, firearm

> accessory or ammunition to federal regulation. It is declared by the legislature that such component parts are not firearms, firearms accessories or ammunition and are not subject to congressional authority to regulate firearms, firearms accessories and ammunition under interstate commerce as if they were actually firearms, firearms accessories or ammunition.

K.S.A. § 50-1204(c) provides:

> Firearms accessories that are imported into Kansas from another state and that are subject to federal regulation as being in interstate commerce do not subject a firearm to federal regulation under interstate commerce because they are attached to or used in conjunction with a firearm in Kansas.

30.     K.S.A. § 50-1205 requires firearm manufacturers to stamp "Kansas" firearms, as defined in the statute, with the words "Made in Kansas."

31.     K.S.A. § 50-1207 imposes criminal liability for failure to comply with the Act's nullification provisions.  K.S.A. § 50-1207 provides:

> It is unlawful for any official, agent or employee of the government of the United States, or employee of a corporation providing services to the government of the United States to enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas.

32.     K.S.A. § 50-1207 further provides that "violation of this section is a severity level 10 nonperson felony."

33.     K.S.A. § 50-1208 permits the state attorney general, and county and district attorneys, to seek injunctive relief to enforce the provisions of K.S.A. § 50-1207.

34.     K.S.A. § 50-1206(b) contains similar prohibitions and potential civil liability for state and local officials, agents, and employees.  K.S.A. § 50-1206(b) provides:

> No official, agent or employee of the state of Kansas, or any political subdivision thereof, shall enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas.

**EFFECTS OF THE ACT**

35.     The Act purports to nullify "any" federal law that Kansas deems to violate the Second Amendment, and specifically nullifies all federal firearms laws with respect to "Kansas" guns. The federal laws purportedly nullified by the Act include the National Firearms Act of 1934 (26 U.S.C. Chapter 53, as amended) and the Gun Control Act of 1968 (18 U.S.C. Chapter 44, as amended). As set forth below, the Act's nullification of these federal firearms regulations threatens the safety and well-being of the Brady Campaign's Kansas members.

36.     The Act's nullification provisions allow illegal immigrants, dishonorably discharged veterans, and individuals who have renounced United States citizenship to possess "Kansas" firearms. The Gun Control Act prohibits such people from possessing firearms. 18 U.S.C. § 922(g)(5)-(7). The Act purports to exempt "Kansas" firearms from these laws. Kansas has no comparable state laws.

37.     The Act's nullification provisions allow unlicensed and undocumented sales of "Kansas" firearms. Law enforcement officers would have no record of ownership for a gun used in a crime, even if the firearm was legally sold by a firearms dealer. The Gun Control Act of 1968, by itself and as amended by the Firearm Owners' Protection Act, requires individuals and companies who engage in the sale of firearms to obtain a Federal Firearms License ("FFL"). 18 U.S.C. § 923. There are multiple classes of FFL. For example, a Type 1 FFL is required for a traditional gun dealer or gunsmith. FFL licensees must retain firearms transaction records, including the identity of the purchaser, the identity of the firearm, and a certification that the purchaser is legally eligible to purchase the firearm. These records are available for inspection to aid in a criminal investigation. The Act purports to exempt "Kansas" firearms from these laws. Kansas has no comparable state laws.

38.     The Act's nullification provisions allow the unlicensed manufacture of firearms in Kansas. As with firearms dealers, federal law requires firearms manufacturers to obtain an FFL. 18 U.S.C. § 923. For example, a Type 7 FFL is required for traditional firearms manufacturers. A Type 10 FFL is required for manufacturers of destructive devices or armor piercing

13

ammunition.  Regulations under the National Firearms Act likewise require application to the ATF before making a firearm, and to submit to the ATF a notice of firearms manufactured including the type of firearms manufactured and their serial numbers.  29 C.F.R. § 479.103.  The Act purports to exempt "Kansas" firearms from these laws and regulations.  Kansas has no comparable state laws.  Thus, the Act allows "Kansas" firearms manufacturers to engage in the unlicensed and undocumented manufacture of "Kansas" firearms, and without retaining records

39.     The Act's nullification provisions prohibit background checks for "Kansas" firearms.  The Brady Handgun Violence Prevention Act, an amendment to the Gun Control Act, requires that background checks be conducted on individuals before a firearm may be purchased from a federally licensed dealer.  18 U.S.C. § 922(s)(1).  Because Kansas is not a point of contact state for the National Instant Criminal Background Check System, Kansas firearms dealers must initiate the background check by contacting the Federal Bureau of Investigation ("FBI").  The Act purports to exempt "Kansas" firearms from this law.  Kansas has no comparable state law.  Thus, the Act purports to allow "Kansas" firearms dealers to sell "Kansas" firearms without conducting background checks.  Moreover, K.S.A. §§ 50-1206 through 1207 purport to criminalize the act of requesting and providing a background check through the FBI for a Kansas firearm, because doing so would constitute an attempt to enforce the laws and regulations of the United States regarding a firearm.

40.     The Act's nullification provisions obstruct the tracking of illegal guns used in crimes in Kansas.  Pursuant to the Gun Control Act, the ATF maintains a National Tracing Center that helps law enforcement agencies determine the background of firearms recovered at crime scenes.  The National Tracing Center uses FFL records to help investigators determine the owner of a recovered firearm and link a firearm to a suspect.  The ATF is the only agency that provides firearms tracing capability in Kansas.  The ATF provided 2,537 traces for firearms recovered in Kansas in 2012, including 64 traces for firearms recovered in connection with

sf-3388071

homicides and 336 traces in connection with dangerous drugs.[3]  Half of these, or 1,287 traces, were for firearms that originated in Kansas.  Under the Act, "Kansas" firearms are exempt from this tracing system.  The Act also purports to make it a crime for federal agents to trace a "Kansas" firearm, even to assist Kansas law enforcement.  By hampering the ability of law enforcement to trace firearms used in crimes, the Act makes it more difficult to catch criminals and will encourage criminals to use "Kansas" firearms in the commission of their crimes.

41.     The Act's nullification provisions obstruct the investigation of interstate and international gun trafficking through Kansas.  In addition to identifying the owners of firearms recovered from crime scenes, the National Tracing Center helps detect national and international firearms trafficking patterns and potential traffickers.  The Act purports to exempt "Kansas" firearms from the tracing system.  Yet the Act contains no requirement for firearms dealers to verify the residency of a purchaser before selling an untraceable "Kansas" firearm.  Neither the Act nor Kansas state law generally contains any prohibition on the private sale or transfer of untraceable "Kansas" firearms to non-Kansas residents.  Even prior to the Act, Kansas was a net exporter of crime guns, and Kansas exports as many as twice the number of crime guns that it imports.[4]  The Act threatens to make Kansas a haven for illegal firearms traffickers.

42.     The Act's nullification provisions allow the manufacture of "Kansas" firearms without serial numbers.  The Gun Control Act and National Firearms Act require firearms manufacturers to identify firearms by engraving or etching serial numbers upon the weapon. 18 U.S.C. § 923(i).  These serial numbers are necessary to trace the ownership and legality of a weapon.  Firearms without serial numbers are ideal for use by criminals, because they are virtually untraceable.  The Act purports to exempt "Kansas" firearms from these serial number requirements.  Kansas state law prohibits defacing an existing serial number, but does not require

---

[3] *See* https://www.atf.gov/sites/default/files/assets/statistics/tracedata-2012/2012-trace-data-kansas.pdf (last accessed Jul. 8, 2014).

[4] *See* http://www.tracetheguns.org/#/states/KS/exports/ (last accessed Jul. 8, 2014) (in 2009, Kansas exported 531 crime guns and imported 248 crime guns).

firearms manufacturers to engrave serial numbers on weapons that they manufacture.  K.S.A. § 21-6306.  The Act thus purports to allow "Kansas" firearm manufacturers to produce firearms without serial numbers and Kansas firearm dealers to sell firearms without serial numbers.  Such firearms appeal to criminals and facilitate gun crime.

43.     The Act's nullification provisions allow the manufacturing, importation, sale, and possession of "Kansas" firearms designed to avoid metal detectors and airport security.  The Gun Control Act prohibits the manufacture, import, sale, shipment, delivery, possession, transfer, or reception of firearms that (after removal of certain components) are not detectable by walk-through metal detectors.  18 U.S.C. § 922(p)(1)(A).  The Gun Control Act also prohibits major components of firearms that do not generate accurate images in airport x-rays.  18 U.S.C. § 922(p)(1)(B).  These laws are intended to reach firearms, such as plastic guns, that are made to evade detection by security screenings.  The Act purports to exempt "Kansas" firearms from these laws.  Kansas has no comparable state laws.  Under the Act, it is legal to manufacture, sell, and possess "Kansas" firearms designed to avoid security screenings.

44.     The Act's nullification provisions allow the unrestricted manufacture of uncoated armor-piercing ammunition in Kansas.  Armor-piercing ammunition is designed to penetrate metal or armor, such as the body armor commonly worn by law enforcement officers, and typically employs a full jacketed bullet or a bullet made of a material like tungsten or hardened steel.  The Gun Control Act prohibits the manufacture, importation, and sale of armor-piercing ammunition with narrow exceptions, such as sale to government agencies.  18 U.S.C. §§ 921(a)(17), 922(a)(7)-(8).  The Act purports to exempt Kansas-made ammunition from these laws.  Kansas prohibits only the manufacture and possession of plastic-coated armor-piercing ammunition.  K.S.A. § 21-6301(6).  The Act allows manufacturers to freely manufacture uncoated armor-piercing ammunition.

45.     Although both the U.S. Congress and the United States Supreme Court have recognized that "[f]irearms and domestic strife are a potentially deadly combination," *U.S. v. Castleman*, 134 S.Ct. 1405, 1408 (2014) (internal citations omitted), the Act's nullification

provisions allow violent domestic abusers with two or fewer convictions for domestic battery to possess "Kansas" firearms.  The Gun Control Act prohibits firearm ownership by a person who is subject to a court order restraining such person from harassing, stalking, or threatening an intimate partner or a child of such intimate partner.  18 U.S.C. § 922(g)(8).  The Gun Control Act also prohibits firearm ownership by a person who has been convicted in any court of a misdemeanor crime of domestic violence.  18 U.S.C. § 922(g)(9).  The Act purports to exempt "Kansas" firearms from these laws.  Kansas state law does not consider certain domestic battery convictions felonies unless an individual has been convicted more than two times in five years. K.S.A. § 21-5414.  Thus, the Act allows abusive partners to possess "Kansas" firearms.  *See* K.S.A. § 21-6304 (criminalizing possession of firearms by convicted felons only).

46.     The Act's nullification provisions allow the sale of "Kansas" handguns to individuals aged 18-21.  The Gun Control Act prohibits the sale or transfer of firearms other than shotguns or rifles to individuals younger than 21.  18 U.S.C. §§ 922(b); 922(x).  The Act purports to exempt "Kansas" firearms from this law.  Kansas state law only prohibits transferring a firearm with a barrel less than 12 inches long to any person under 18 years of age.  K.S.A. § 21-6301(7).  Due to the Act, there is no law against selling or transferring "Kansas" handguns to individuals aged 18-21.

47.     The Act's nullification provisions prevent local authorities in Kansas from referring gun crimes to federal agencies, including gun trafficking and illegal gun sales that are enforced by federal authorities.  Kansas law enforcement officers, including sheriffs, police officers, and Highway Patrol troopers, participate in joint task forces with federal agents.  At least some of these joint task forces involve the enforcement of federal firearms laws.  The Act removes the authority of officers or employees of Kansas to enforce federal firearms laws regarding Kansas firearms.  *See* K.S.A. § 50-1206(b).  The Act makes it a crime for agents of the United States government to enforce federal firearms laws and regulations as to "Kansas" firearms, including the Gun Control Act and National Firearms Act.  The Act prohibits, and possibly criminalizes, local law enforcement participation on federal task forces.  The Act makes

17

it a crime for local law enforcement to refer gun crimes to federal agencies for prosecution.

48.     The Act's nullification provisions criminalize federal investigations of gun crimes in Kansas.  Federal law enforcement, including the FBI and ATF, is charged with enforcing federal law within the state of Kansas.  This includes enforcing federal firearms laws.  The Act makes it a severity level 10 nonperson felony for officials, agents, or employees of the government of the United States, or employees of a corporation providing services to the government of the United States, to enforce federal firearms laws and regulations, including the Gun Control Act and National Firearms Act, as to "Kansas" firearms.  K.S.A § 50-1207.  The Act makes it a crime for federal agents to enforce federal law in Kansas.

49.     The Act's nullification provisions risk placing undocumented and untraceable firearms and uncoated armor-piercing ammunition into the interstate stream of commerce in Kansas.  As discussed above, the Act allows the unregulated manufacture and sale of "Kansas" firearms, firearm accessories, and ammunition.  The Act also allows the purchase of these weapons with no background checks, no records, and no serial numbers.  The Act creates opportunities for violent criminals and "straw buyers."  Inevitably, residents of other states will use Kansas's lax laws to obtain firearms that they could not purchase in their home states.

50.     The Act's nullification provisions apply not just to "Kansas" firearms, but also can be interpreted to nullify the enforcement of *all* federal firearms laws in the State of Kansas.  Thus, each of the foregoing examples of changes in firearms laws with respect to "Kansas" firearms, could apply equally to non-"Kansas" firearms in the State.

51.     These changes in the law harm Brady Campaign members by, among other things, reducing their safety and increasing their fear of gun violence.  Because of the Act, more untraceable guns will enter the stream of commerce and more dangerous individuals will be able to acquire guns that they were previously prohibited from purchasing.  In addition, law enforcement investigations into gun-related crimes will be hampered by the threat of criminal and civil liability against anyone who attempts to enforce federal firearm laws, further decreasing the Brady Campaign members' safety and increasing their fear of gun violence.  Among other

things, Brady members such as Paul Temme, who was recently targeted by the white supremacist Frazier Glenn Miller at the mass shooting at Kansas City JCC, fear that the Act will cause an increase in gun violence and a decrease in safety because other previously prohibited purchasers, such as Miller, will now be able to acquire weapons without background checks.  Brady member Harold Koch, a long-standing member of the Kansas City JCC and a volunteer at the Village Shalom Geriatric Center, fears that his frequent presence at these two institutions which have been targets of gun violence motivated by religious hatred puts him at a greater risk of gun violence, and that this risk is exacerbated by the Act.  In addition, Brady members such as Susan Blaney fear that their advocacy efforts on behalf of gun violence prevention makes them potential targets by people who would not otherwise be able to acquire firearms, but for the Act. Further, Brady Member Crosby Gernon may be exposed to criminal or civil liability due to the overly vague and broad wording of the Act, as he is a local official and an agent of a state-sponsored institution, and is also a coalition member of Mayors Against Illegal Guns, which works to "find innovative new ways to advance [certain] principles" including punishing criminals who possess, use and traffic in illegal guns.[5]

## COMMERCE CLAUSE

52.     The Act's attempt to exempt "Kansas" firearms from federal law is nothing more than the Kansas legislature's attempt to re-write federal Commerce Clause law and define limitations on congressional authority that are plainly contrary to established federal law.  Thus, Kansas cannot succeed in its nullification efforts even with respect to "Kansas" firearms.

53.     The Act's definition of "Kansas" firearms is based on the a declaration about the extent of federal congressional authority under the Commerce Clause.  The Act simply declares that "Kansas" firearms are "not subject to any federal law . . . under the authority of congress to regulate interstate commerce."  Under the Supremacy Clause, however, Kansas has no authority

---

[5] Mayors Against Illegal Guns, Coalition Principles, available at http://prtl-sitea-maigs.nyc.gov/html/about/principles.shtml (last accessed, Jul. 8, 2014).

sf-3388071

to declare what federal law is.  That authority is reserved to federal courts.  It is indisputable that Kansas's proposed limitations on the Commerce Clause directly conflict with federal law.

54.     The Constitution grants Congress the authority, without limitation, "[t]o regulate commerce . . . among the several States . . . ."  U.S. Const. art. I, § 8, cl. 3.  The United States Supreme Court holds that the "power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small."  *Hodel v. Indiana*, 452 U.S. 314, 324 (1981) (quoting *NLRB v. Fainblatt*, 306 U.S. 601, 606 (1939)); *accord Gibbons v. Ogden*, 22 U.S. 1 (1824).  Thus, "state action cannot circumscribe Congress' plenary commerce power . . . ." *Gonzales v. Raich*, 545 U.S. 1, 29 (2005).  Under its Commerce Clause power, Congress may regulate (i) the channels of interstate commerce; (ii) the instrumentalities of interstate commerce and persons or things in interstate commerce; and (iii) "activities that substantially affect interstate commerce."  *Raich*, 545 U.S. at 17.

55.     The Supreme Court held in *Raich* that "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."  *Id.* (citing *Wickard v. Filburn*, 317 U.S. 111 (1942); *Perez v. United States*, 402 U.S. 146, 151 (1971)).  When "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence."  *Id.*  So long as "the class of activities is regulated and that class is within the reach of federal power" under the Commerce Clause, "the courts have no power 'to excise, as trivial, individual instances' of the class."  *Perez v. United States*, 402 U.S. 146, 154 (1971).

56.     In enacting firearms legislation, Congress has made extensive findings that firearms affect interstate commerce.  Congress specifically found that "[o]nly through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible."  S. Rep. No. 1097, 90th Cong., 2nd Sess. 1968, 1968 U.S.C.C.A.N. 2112, 2114; *see also United States v.*

20

*Wilks*, 58 F.3d 1518, 1521 (10th Cir. 1995) (quoting legislative history).

57.     Congress has likewise found that "firearms and ammunition move easily in interstate commerce . . . ." 18 U.S.C. § 922(q)(1)(C).  Notably, the Gun Control Act states that "even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce," and the Act acknowledges that firearm component parts and firearms accessories are imported into Kansas from other states.  18 U.S.C. § 922(q)(1)(D); K.S.A. §§ 50-1202(4)(b)-(c).

58.     In the exercise of its Commerce Clause authority, Congress has enacted "comprehensive legislation to regulate the interstate market in a fungible commodity."  *See Raich*, 545 U.S. at 22.  This firearms regulation properly reaches the intrastate manufacture, ownership, and possession of firearms and ammunition.  Kansas has no power to "carve out" intrastate "Kansas" firearms from the comprehensive federal regulation.

59.     The United States Court of Appeals for the Tenth Circuit explicitly upheld federal regulation of entirely intrastate possession of firearms.  *United States v. Haney*, 264 F.3d 1161 (10th Cir. 2001).  The court held that the firearm regulation was an "essential part of the federal scheme to regulate interstate commerce in dangerous weapons."  *Id.* at 1168.  The court found "no question that the market in firearms generally is heavily interstate — indeed, international — in character."  *Id.* at 1169 (citing 18 U.S.C. § 922(q)(1)(D)).  The court also found that "[b]ecause of the ease of moving weapons across state and national lines, Congress has rationally concluded that it cannot rely on the states to control the market in these devices by themselves."  *Id.*  Another federal appellate court squarely rejected a Montana law that attempted to do exactly what Kansas attempts here—to carve out an intrastate firearms market that Congress cannot regulate.  *See Montana Shooting Sports Ass'n. v. Holder*, 727 F.3d 975, 982-983 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 955,  *cert. denied*, 134 S. Ct. 1335 (2014) ("Congress could have rationally concluded that the manufacture of unlicensed firearms, even if initially sold only within the State of Montana, would in the aggregate substantially affect the interstate market for firearms.  Under *Raich* and *Stewart*, that is enough to place the [purportedly intrastate firearm]

sf-3388071

within reach of the long arm of federal law.  Because the MFFA purports to dictate to the contrary . . . it is necessarily preempted and invalid.").

60.     It is beyond dispute that firearms and gun violence affect interstate commerce. Nationwide, nearly 110,000 people are shot each year, with more than 30,000 dead from gunfire.[6]  The cost to the nation from gun trafficking and gun violence is at least $100 billion per year, or about $360 for every American.[7]  Annually, more than 42,000 guns cross state lines before being recovered in crimes, and most of these guns flow from states with weaker gun laws to states with stronger gun laws.[8]  Under well-established authority, Congress has power to regulate this interstate market, even if its laws extend to purely intrastate activities.  The Act directly conflicts with federal law.

## DUE PROCESS

61.     The Act makes it a severity level 10 nonperson felony for "any official, agent or employee of the United States government, or employee of a corporation providing services to the government" to enforce or attempt to enforce federal law with respect to "Kansas" firearms. K.S.A § 50-1207.  Severity level 10 nonperson felonies are subject to presumptive sentencing of up to 12 months of probation with 5-7 months potential prison time, and a fine of up to $100,000.

62.     However, the Act does not provide any insight into what federal laws are at issue, the standards for enforcement of the Act, or who could be found culpable under the Act.  For example, the Act offers no specificity regarding the definition of an "agent" of the United States government or what constitutes a "corporation providing services to the government."  Nor does

---

[6] National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (2006 (deaths) and 2008 (injuries)).

[7] *See* Gun Violence: The Real Costs 117 (Phillip J. Cook & Jens Ludwig eds., Oxford Univ. Press 2000); *See also* Wendy Max & Dorothy P. Rice, *Data Watch: Shooting In The Dark: Estimating The Cost of Firearm Injuries*, Health Affairs (Winter 1993) 171, 181.

[8] Mayors Against Illegal Guns, *The Movement of Illegal Guns in America* (2008) at 5-6 (citing Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives).

sf-3388071

the Act specify what constitutes "enforcement" or "attempted enforcement" of federal law.

63.     Although the Act makes it a felony to enforce or attempt to enforce federal law as to "personal firearm[s], firearm accessor[ies] or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas," the statute is silent as to how an individual potentially subject to this criminal law can determine whether a firearm or accessory is in fact a "Kansas" firearm or a non-"Kansas" firearm.  It is, of course, nonsensical to expect a potential enforcer to know whether a firearm has in fact remained within the State of Kansas.  It is equally nonsensical to expect a "Made in Kansas" stamp to indicate whether a firearm has in fact remained in the State.  Among other problems and absurdities inherent in using such a stamp to define the limits of federal authority, the Act requires the manufacturer to place the stamp on the gun ***before*** the firearm has even entered the stream of commerce.  The manufacturer cannot know where the weapon will end up.

64.     The Act also imposes prohibitions and potential civil liability for state and local officials, agents, and employees.  The Act prohibits such individuals from enforcing or attempting to enforce "any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas."  The Act, however, provides no insight into what federal laws are at issue, the standards for enforcement of the Act, or who could be found culpable under the Act.  There is no specificity regarding the definition of an "agent," and the Act fails to specify what constitutes "enforcement" or "attempted enforcement" of federal law.  Due to the vagueness of the Act's liability provisions, individuals potentially subject to liability lack sufficient information to understand how to conduct themselves without potentially running afoul of the law.

65.     As written, the Act subjects local, state, and federal government officials, such as Brady member Crosby Gernon, to criminal prosecution and civil liability for simply doing their jobs.

66.     The Act grossly infringes upon the right to due process under the Fourteenth Amendment of the United States Constitution and under Bill of Rights of the Kansas Constitution.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

67.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Plaintiff contends that its members are harmed and continue to face imminent threat of harm due to the Act, and that the Act violates the United States Constitution and the Kansas Constitution.  Defendants are obligated to enforce the Act unless it is found to be illegal.

68.     In violating Plaintiff's members' rights under the United States Constitution and the Kansas constitution, Defendants will be acting under color of law.

69.     Unless enjoined, the Act will cause irreparable injury to Plaintiff's members' federal and state constitutional rights.

70.     Plaintiff's members have no plain, speedy, and adequate relief at law against the Act other than the relief requested in this Complaint.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment and Injunctive Relief—Supremacy Clause)

71.     Plaintiff incorporates herein by reference the allegations in all preceding paragraphs of this Complaint.

72.     The Supremacy Clause, Article VI, Clause 2, of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

73.     The Supremacy Clause mandates that federal law preempts state law in any area where state law conflicts or interferes with federal law.  Thus, state law that conflicts with

24

federal law has no effect and cannot be enforced.

74.     K.S.A § 50-1206(a) declares null and void "any act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States."

75.     K.S.A § 50-1204(a) declares null and void "any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program" with respect to "Kansas" firearms and accessories, as defined in the statute.

76.     K.S.A §§ 50-1204(a)-(c) purport to define limitations to federal congressional authority to regulate firearms and firearm accessories pursuant to the Commerce Clause of the United States Constitution.

77.     These provisions of the Act conflict with federal laws and policies, imposes burdens and penalties on citizens not authorized by and contrary to federal law, and impose burdens on the federal government's resources and processes, including criminalizing the enforcement of federal laws by federal employees and creating liability against any person or entity attempting to enforce federal laws, in violation of the Supremacy Clause.

78.     Judicial intervention, through declaratory judgment, is required to provide relief to Plaintiff's members from this conflict, and to add clarity as to which law (federal or state) governs.

79.     Accordingly, Plaintiff is entitled to a declaration, under 28 U.S.C. § 2201, that the Act is preempted under and violates the Supremacy Clause of the United States Constitution.

80.     Plaintiff also is entitled to preliminary and permanent injunctive relief preventing the enforcement of the Act.

### SECOND CAUSE OF ACTION
(Violation of Fourteenth Amendment—Due Process: Vagueness)

81.     Plaintiff incorporates herein by reference the allegations in all preceding paragraphs of this Complaint.

82.     The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person

25

sf-3388071

of life, liberty, or property, without due process of law."

83.     The Act declares null and void "[a]ny act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States," without defining those phrases.

84.     The Act criminalizes as a "severity level 10 nonperson felony" the enforcement of federal law as to "personal firearm[s], firearm accessor[ies] or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas," without defining those phrases.

85.     The Act prohibits state and local "official[s], agent[s] or employee[s]" from "enforc[ing] or attempt[ing] to enforce" any federal firearm laws, without defining those phrases. The Act fails to elucidate any potential punishment for violation of this prohibition and fails to set forth standards for the enforcement of this provision.

86.     The Act criminalizes as a "severity level 10 nonperson felony" the enforcement of federal laws by "any official, agent, or employee of the government of the United States, or employee of a corporation providing services to the government of the United States," without defining those phrases. The Act fails to identify who could be liable for criminal sanctions under its terms.

87.     The Act also creates a right of action for injunctive relief by a "county or district attorney, or the attorney general, [who] may seek injunctive relief in any court of competent jurisdiction to enjoin any official, agent or employee of the government of the United States or employee of a corporation providing services to the government of the United States from enforcing any act, law, treaty, order, rule or regulation of the government of the United States."

88.     Because the Act fails to articulate clear standards, it is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

89.     Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, the Act is so vague that Brady Campaign members are unable to clearly determine what conduct would result in criminal prosecution and/or civil liability.

90.     Plaintiff and its members have no adequate remedy at law for this continuing violation of their constitutional rights.

91.     Plaintiff is therefore entitled to declaratory and injunctive relief, as well as attorney's fees and all other appropriate relief, to vindicate the violation of its members' Fourteenth Amendment right not to be subject to punishment by a vague statute.

## THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983)

92.     Plaintiff incorporates herein by reference the allegations in all preceding paragraphs of this Complaint.

93.     The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."

94.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

95.     The Act deprives Plaintiff's members of their federal constitutional rights under the Fourteenth Amendment as alleged herein.

96.     Defendants are charged with enforcing the statute.  As Defendants are acting under the mandate of the State of Kansas, they are state actors.

97.     Plaintiff and its members have no adequate remedy at law for this continuing violation of their constitutional rights.

98.     Plaintiff is therefore entitled to declaratory and injunctive relief, as well as attorney's fees and all other appropriate relief, to remedy the statute's violation of Plaintiff's members' constitutional rights and Section 1983.

sf-3388071

**FOURTH CAUSE OF ACTION**
(Kansas Right to Due Process: Vagueness)

99.     Plaintiff incorporates herein by reference the allegations in all preceding paragraphs of this Complaint.

100.     Section 1 of the Kansas Bill of Rights provides that "[a]ll men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Section 2 of the Kansas Bill of Rights provides that "[a]ll political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit."  "These two provisions are given much the same effect as the clauses of the Fourteenth Amendment relating to due process . . . ."  *State ex rel. Tomasic v. Kansas City*, 230 Kan. 404, 426, 636 P.2d 760, 777 (1981).

101.     Section 10 of the Kansas Bill of Rights provides that "[i]n all prosecutions, the accused shall be allowed . . . to demand the nature and cause of the accusation against him . . . ." "Whether a statute is vague and indefinite and therefore fails to inform the accused of the nature and cause of the accusation against him, as required by Section 10 of the Bill of Rights of the Constitution of Kansas, is determined by the same test applicable to whether the statute violates the due process clause under the Fourteenth Amendment to the Federal Constitution."  *State ex rel. Smith v. Fairmont Foods Co.*, 196 Kan. 73, 78, 410 P.2d 308, 313 (Kan. 1966).

102.     Section 18 of the Kansas Bill of Rights provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

103.     The Act declares null and void "[a]ny act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment  to the constitution of the United States," without defining those phrases.

104.     The Act criminalizes as a "severity level 10 nonperson felony" the enforcement of federal law as to "personal firearm[s], firearm accessor[ies] or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas,"

28

without defining those phrases.

105.    The Act criminalizes as a "severity level 10 nonperson felony" the enforcement of federal laws by "any official, agent, or employee of the government of the United States, or employee of a corporation providing services to the government of the United States," without defining those phrases.  The Act fails to identify who could be liable for criminal sanctions under its terms.

106.    The Act prohibits state and local "official[s], agent[s] or employee[s]" from "enforc[ing] or attempt[ing] to enforce" any federal firearm laws, without defining those phrases. The Act fails to elucidate any potential punishment for violation of this prohibition and fails to set forth standards for the enforcement of this provision.

107.    The Act also creates a right of action for injunctive relief by a "county or district attorney, or the attorney general, [who] may seek injunctive relief in any court of competent jurisdiction to enjoin any official, agent or employee of the government of the United States or employee of a corporation providing services to the government of the United States from enforcing any act, law, treaty, order, rule or regulation of the government of the United States."

108.    Because the Act fails to convey sufficient definite warning and fair notice as to the prohibited conduct, and fails to guard against arbitrary and discriminatory enforcement, it is unconstitutionally vague under the due process provisions of the Kansas Bill of Rights.

109.    Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, the Act is so vague that Plaintiff's members are unable to clearly determine what conduct would result in criminal prosecution and/or civil liability.

110.    Plaintiff and its members have no adequate remedy at law for this continuing violation of their constitutional rights.

111.    Plaintiff is therefore entitled to declaratory and injunctive relief, as well as attorney's fees and all other appropriate relief, to vindicate the violation of their right to due process under the Kansas Bill of Rights.

**PRAYER FOR RELIEF**

29

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor, and against all Defendants, for full relief, including the following:

A.      Declaratory judgment finding that the Act is unconstitutional;

B.      Preliminary and permanent injunctive relief prohibiting enforcement of the Act;

C.      Attorney's fees, costs, and expenses incurred by Plaintiff in connection with this action; and

D.      Such other and further relief as the Court deems just and proper, or which is otherwise available at law, equity, or under any applicable rule or regulation.

Dated:  July 9, 2014                    Respectfully submitted,

                                        s/James R. Wyrsch
                                        James R. Wyrsch            KSD#70201
                                        jimwyrsch@whmlaw.net
                                        WYRSCH HOBBS MIRAKIAN, P.C.
                                        1000 Walnut Street
                                        Suite 1600
                                        Kansas City, MO 64106
                                        Telephone:  816.221.0080
                                        Facsimile:  816.221.3280

                                        Stuart C. Plunkett*
                                        splunkett@mofo.com
                                        MORRISON & FOERSTER LLP
                                        425 Market Street
                                        San Francisco, California 94105-2482
                                        Telephone:  415.268.7000
                                        Facsimile:  415.268.7522

                                        John Lanham*
                                        jlanham@mofo.com
                                        MORRISON & FOERSTER LLP
                                        12531 High Bluff Drive, Suite 100
                                        San Diego, California 92130-2040
                                        Telephone: 858.720.5100
                                        Facsimile: 858.720.5125

                                        Christopher Sousa*
                                        csousa@mofo.com
                                        MORRISON & FOERSTER LLP
                                        2000 Pennsylvania Ave. NW
                                        Washington, D.C. 20006-1888
                                        Telephone:  202.887.1508
                                        Facsimile:  202.887.0763

sf-3388071

Jonathan E. Lowy*
jlowy@bradymail.org
Elizabeth M. Burke
eburke@bradymail.org
Alla Lefkowitz*
alefkowitz@bradymail.org
BRADY CAMPAIGN TO PREVENT GUN
VIOLENCE – LEGAL ACTION PROJECT
840 First Street NE, Suite 400
Washington, DC 20002
Telephone:  202.370.8104
Facsimile:  202.370.8102

*Pro hac vice applications pending

***Attorneys for Plaintiff***